**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| HOLLIE N. WANGERIN, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| STRATFORD ACADEMY, INC., | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Plaintiff Hollie N. Wangerin, and brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended, the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* Plaintiff alleges that Defendant Stratford Academy, Inc. subjected Plaintiff to discrimination based her sex and disability, including through its failure to provide a reasonable accommodation, interfered with Plaintiff's rights under the Family and Medical Leave Act, and subjected Plaintiff to retaliation after Plaintiff engaged in protected activities, respectfully showing the Court as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 & 1343 and the enforcement provisions of Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Rehabilitation Act, and the Family and Medical Leave Act.

2.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was employed, and the events underlying this action occurred, in Macon-Bibb County, Georgia, which is located within this judicial district.

## PARTIES

3.

Plaintiff Hollie N. Wangerin (hereinafter, "Plaintiff" or "Wangerin") is a citizen of the United States and a resident of Georgia.  At all times relevant to this suit, Ms. Wangerin was employed with Defendant Stratford Academy, Inc.

4.

At all relevant times, Ms. Wangerin was considered a covered, non-exempt employee under Title VII of the Civil Rights Act, the Americans with Disabilities Act, and the Rehabilitation Act.

5.

Defendant Stratford Academy, Inc. (hereinafter, "Defendant") is a domestic nonprofit corporation that operates an independent and nonsectarian private school, offering educational programs to children from Preschool through 12th Grade.  Defendant's principal office is located at 6010 Peake Road, Macon, Bibb County, Georgia 31220, and Defendant may be served with process by delivering a copy of the Summons and Complaint to its Registered Agent, Dr. Rachel Adams, located at the same.

6.

Defendant is a private educational institution that is engaged in interstate commerce, including through its purchase of supplies, materials, and books from outside of the State of Georgia, and Defendant has an annual revenue in excess of $500,000.00. Upon information and belief, Defendant employed between 100 and 200 individuals, working at least 20 calendar weeks, in the year 2023, and in prior calendar years.

7.

Defendant is a covered employer within the meaning of Title VII of the Civil Rights Act and the Americans with Disabilities Act.

8.

Defendant is also a covered employer under the Rehabilitation Act because Defendant receives federal grants of assistance and otherwise has contracts with the federal government.

9.

At all relevant times to this action, Plaintiff had worked for Defendant for at least twelve months, she worked for at least 1,250 hours during the twelve months preceding her leave, and she worked at a location where Defendant had at least 50 employees within a 75-mile area. As a result, Defendant is a covered employer under the Family and Medical Leave Act.

**STATEMENT OF FACTS**

10.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 9, as if the same were set forth herein.

11.

Ms. Wangerin first became employed with Defendant in the year 1991, where she would work for the following two years. In 1993, Defendant offered to extend Ms. Wangerin's teaching contract through the following academic year, but Ms. Wangerin ultimately declined this offer in order to take a teaching position at a public school that offered better pay and benefits.

12.

In around 2011, Ms. Wangerin returned to her employment with Defendant, first serving as a tutor in Defendant's Learning Support Center, later taking a position as a substitute teacher, and ultimately becoming a full-time teacher in Defendant's high school-level (known as the "Upper School") History Department.

13.

As evidenced in part by the fact that Defendant hired Ms. Wangerin, and then renewed her teaching contract at least seven more times, Ms. Wangerin was qualified for her position, and her performance was always satisfactory if not exemplary.

14.

The early days of the COVID-19 pandemic had several tangible impacts on Ms. Wangerin's employment with Defendant.

15.

First, Defendant had a significant number of its educators resigned or retired at the end of the 2019-2020 academic year, resulting in Defendant anticipating a critical shortage of teachers for the 2020-2021 academic year.

16.

Additionally, Ms. Wangerin became infected with a serious case of COVID-19 infection in or around June 2020. Ms. Wangerin's symptoms were so serious, and were longer in duration than average, resulting in Ms. Wangerin's medical providers determining that she was experiencing a medical condition known called post-acute COVID-19 syndrome, or "Long COVID."

17.

Around the same time, Ms. Wangerin sent an email to administrators about the fatigue she was experiencing as a result, and the administrator's response made it clear that they understood Ms. Wangerin's request to be one for leave and/or an accommodation for a medical condition.

18.

Several months later, in Fall 2020, Ms. Wangerin was continuing to routinely experience shortness of breath, heart palpitations, and feelings of extreme exhaustion.

19.

In addition to trying to recover from her own illness, Ms. Wangerin was caring for her father who was battling cancer at the time.

20.

Despite her illness and familial responsibilities, Ms. Wangerin decided to return to her teaching position during the 2020-2021 academic year, in part because of Defendant's shortage in teachers at that time.

21.

When Ms. Wangerin returned for the 2020-2021 academic year, she specifically requested that Defendant provide air purifiers in Ms. Wangerin's workspace due to the Long COVID she was experiencing and because Ms. Wangerin's father's cancer recovery put him at particular risk.

22.

Defendant explicitly denied Ms. Wangerin's request to be provided with an air purifier for her classroom.

23.

Around the same time, another one of Defendant's employees made similar requests for accommodation for her work area because her own cancer diagnosis made her high risk if infected with COVID-19.

24.

Defendant also denied Ms. Wangerin's coworker's request for reasonable accommodation.

25.

As a result of this denial, this coworker and her spouse who was also employed with Defendant, resigned from their respective positions with Defendant.

26.

During the Fall 2020 semester, Ms. Wangerin continue to experience frequent and intense episodes of shortness of breath, heart palpitations, and feelings of extreme exhaustion.

27.

Around that time, Ms. Wangerin met with Defendant's Principal, Theresa Ferrari, (hereinafter, "Principal Ferrari") to discuss these concerns that she was having with her health.

28.

Ms. Wangerin also explained to Principal Ferrari that she was planning to see specialists at Emory Hospital in Atlanta for further testing to determine the actual cause of Ms. Wangerin's symptoms.

29.

Ms. Wangerin advised Principal Ferrari at the time that she would need to take a period of leave in order to undergo the testing.

30.

Ms. Wangerin prioritized her work, and particularly, the quality of her instruction and ensuring student learning and wellbeing for the remainder of the calendar year as she waited for the opportunity to schedule her testing.

31.

Around this same time, Ms. Wangerin had learned that the chair of Defendant's History Department planned to begin his slow path to retirement by stepping down as chair.

32.

Not including the outgoing chair, Ms. Wangerin had the second-longest tenure with Defendant at that time, and she was the teacher with the most overall classroom experience. Administrators knew that Ms. Wangerin wanted to be considered to chair the History Department.

33.

It was Ms. Wangerin's understanding that she would be considered for chair once the position became available, and she and a number of her colleagues thought she would have a very good chance of getting the position.

34.

Serving as chair of the History Department brings the added benefit of being assigned one fewer classes to teach, instead having an additional period of planning, which would have been consistent with the requests Ms. Wangerin had made concerning the challenges with her health.

35.

However, during a Spring 2021 History Department meeting, the chair was discussing one of his duties as chair, and he remarked that the task would be someone else's problem next year – suggesting that Defendant had or was about to name his replacement at chair.

36.

Prior to that time, Ms. Wangerin had not realized that Defendant was soliciting applications or otherwise considering candidates for the chair of History Department.

37.

Ms. Wangerin approached Principal Ferrari to inquire as to whether Defendant had indeed chosen someone to fill the vacancy.

38.

Principal Ferrari confirmed that the position had been filled, telling Ms. Wangerin that she had been very busy recently and that Ms. Wangerin had a family to look after.

39.

Principal Ferrari added that Defendant instead chose one of Ms. Wangerin's male colleagues who was "young and single" to fill the position of chair.

40.

Ms. Wangerin was able to schedule her testing with Emory Hospital in late Summer or early Fall 2021.

41.

It was also around this time that Ms. Wangerin's medical providers discovered that Ms. Wangerin had a mass located on her thyroid.

42.

Ms. Wangerin also made an appointment to be administered the COVID-19 vaccination, which Ms. Wangerin scheduled for the Friday prior to the Labor Day weekend just in case she experienced an adverse reaction, there would be minimal disruption to work.

43.

Ms. Wangerin experienced a pretty significant reaction to the COVID vaccine, including Ms. Wangerin experiencing a fluctuating blood pressure and low oxygen levels, causing Ms. Wangerin to seek emergency medical care at the hospital and was referred to other specialists, causing Ms. Wangerin to miss the first two days of work that week.

44.

Among the side-effects caused by the vaccine was the onset of the same heart palpitations that Ms. Wangerin had recently experienced.

45.

Ms. Wangerin made an appointment to see her pulmonologist due to the heart palpitations, and the doctor ordered a series of tests and referred Ms. Wangerin to have both a sleep study and to see another specialist for sinus issues concerning Ms. Wangerin's then-undiagnosed conditions.

46.

Ms. Wangerin started seeing a doctor specializing in sleep disorders in December 2021, and Ms. Wangerin received a diagnosis in February 2022.

47.

Accordingly, Ms. Wangerin lives with a condition called Idiopathic Hypersomnia, and that this condition had been causing Ms. Wangerin's feelings of exhaustion and other symptoms.

48.

Idiopathic Hypersomnia is a rare sleep disorder that causes people like Ms. Wangerin to feel very sleepy throughout the day, even after receiving a full night of quality sleep or even too much sleep. The cause of Ms. Wangerin's condition is unknown. However, it causes Ms. Wangerin to feel a sense of exhaustion at nearly all times that she is awake, and it also appears to be connected with symptoms related to restless leg syndrome. Idiopathic Hypersomnia routinely and unexpected cause individuals like Ms. Wangerin to fall asleep, sometimes while performing tasks such as driving a motor vehicle, even during the daytime. Idiopathic Hypersomnia is a physical or mental condition that substantially limits major life activities for Ms. Wangerin like sleeping, performing manual tasks, and working.

49.

Idiopathic Hypersomnia is considered a disability under the Americans with Disabilities Act and the Rehabilitation Act.

50.

Ms. Wangerin's Idiopathic Hypersomnia resulted in inpatient care and continuing treatment by a healthcare provider, and had the potential of causing Ms. Wangerin to miss work.

51.

Accordingly, Idiopathic Hypersomnia is a serious health condition as defined by the Family and Medical Leave Act.

52.

In addition to the December 2021 diagnosis, there were several other occasions in which Ms. Wangerin was forced to be out of work during the 2021-2022 academic year due to her own health condition or that of the immediate members of her family.

53.

In January 2022, both of Ms. Wangerin's daughters, both of whom were enrolled as students with Defendant, become ill with COVID-19 within weeks of one another.  Defendant sent Ms. Wangerin home for five-day period of isolation when each of her daughters became ill.

54.

Ms. Wangerin also participated in an overnight sleep study in January 2022, but because the overnight study was unsuccessful, she had to stay for a daytime study the following day.

55.

In February 2022, Ms. Wangerin met with Principal Ferrari again, and she explained her new diagnoses of Idiopathic Hypersomnia, and to specifically discuss accommodations.

56.

Ms. Wangerin scheduled a sinus procedure during Spring Break 2022, so she would only have to miss five days of work during her recovery, and Ms. Wangerin even returned back to work prior to when her doctor recommended.  Ms. Wangerin took two afternoons in May 2022 off for another minor medical treatment.

57.

In Spring 2022, Ms. Wangerin met once again with Principal Ferrari, and she explained all of the challenges she had been experiencing with her health.  Ms. Wangerin explained the challenges that she was having with specific regard to her Idiopathic Hypersomnia, and Ms. Wangerin requested a reasonable accommodation in the form of either decreasing her workload

(i.e., the number of classes that Ms. Wangerin was required to teach), or by assigning Ms. Wangerin to teach several classes in the same subject area so as to reduce the amount of planning time required to teach different subjects.

58.

The accommodations that Ms. Wangerin requested would have been effective in allowing Ms. Wangerin to adequately prepare for her classes, despite the challenges that Ms. Wangerin was having in staying awake during after-school hours when she would historically be doing such planning.

59.

Ms. Wangerin had been assigned to teach sophomore World History since 2014. However, in the lead up to the 2022-2023 academic year, Defendant reassigned Ms. Wangerin to teach the freshman history course. Ms. Wangerin would learn that she was only assigned to teach those courses because neither the new male teacher, nor two other male teachers in the History Department, would teach a freshman level course which were generally known to be more challenging.

60.

As a result, Ms. Wangerin was assigned to teach three periods of freshmen-level history, along with three elective history courses that Ms. Wangerin had never taught before; given how challenging such a schedule would be, Defendant did agree to reassign the elective courses and allow Ms. Wangerin to teach two Advanced Placement history courses instead.

61.

Ms. Wangerin reminded administrators of her conversation with Principal Ferrari several months earlier, and the requests for accommodation she made.

62.

Prior to the start of the year, Defendant had also agreed to allow Ms. Wangerin not to have an assigned homeroom class, which would supposedly allow her to have additional planning time.

63.

As the Fall 2022 semester continued, Ms. Wangerin started to feel as though her supervisors were placing undue scrutiny onto her.

64.

Ms. Wangerin had previously scored well on her evaluations, including the evaluation that had been most-recently completed.

65.

However, in the beginning of the Fall 2022 semester, Principal Ferrari advised Ms. Wangerin that she was being placed on a Performance Improvement Plan ("PIP")

66.

It would also later become apparent that this was around the time that Defendant began collecting documentation to place in Ms. Wangerin's personnel file.

67.

When she advised Ms. Wangerin of the PIP, Principal Ferrari failed to advise Ms. Wangerin of any adverse consequences she may experience if she did not complete the PIP.

68.

While Ms. Wangerin was having some challenges resulting from her medical conditions, her performance was well within the standards of satisfactory and quality teaching, and her performance was certainly above average.

69.

However, there had been a number of recent occasions in which Defendant's male teachers had been suspected of engaging in misconduct, but were not subjected to disciplinary action. This includes one classroom teacher who was widely rumored to have consumed marijuana, on campus, during a planning period or break and then returned to the classroom. Another male teacher was not disciplined after he was caught consuming alcohol at work.

70.

Around the same time, in December 2022, Ms. Wangerin asked for a meeting with Defendant's Human Resources Director, which ultimately did not occur until the following month. Ms. Wangerin explained her need for FMLA leave based on her own recent health concerns, as well as to care for her father who was battling cancer. Ms. Wangerin had to follow up with the HR Director the following month.

71.

Ms. Wangerin also explained that she was just trying to make it through February and March 2023.

72.

In addition to discussing Ms. Wangerin's need for FMLA leave, she also told the HR Director that she was in need of an accommodation in the form of a reduction in her hours due to her condition.

73.

While Ms. Wangerin had around the average number of tardy arrivals as the rest of her colleagues, Ms. Wangerin did explain at this time that her medical condition at times causes her to be oversleep or run late at times.

74.

Ms. Wangerin would also explain in this or one of the subsequent conversations around this time that her condition made it extraordinarily difficult to sit for short periods without falling asleep, and that Ms. Wangerin would be in need of additional time to perform some tasks as a result.

75.

The HR Director told Ms. Wangerin to follow up about her requested accommodation after Ms. Wangerin returned from a field trip to Washington, D.C. with Defendant's Model United Nations Program.

76.

While Ms. Wangerin would have preferred to have had the discussion then, they mutually agreed to follow up this discussion after Ms. Wangerin returned from the Model United Nations trip, and she was glad to know that there appeared to be some relief on the horizon.

77.

Neither Defendant's Human Resources Director, nor anyone else, provided Ms. Wangerin with any forms concerning FMLA leave or requests for reasonable accommodation.

78.

Ms. Wangerin was previously asked to take over as the adviser for Defendant's Model United Nations program, but Defendant offered that position to the outgoing chair of the History Department. Still, administrators told Ms. Wangerin during the planning of the trip, "you can help," and Defendant allowed Ms. Wangerin to go.

79.

Ms. Wangerin's colleague received the stipend for serving as Model U.N. adviser that Ms. Wangerin had expected to receive. Ms. Wangerin did not receive any stipend.

80.

By all measures, the Washington, D.C. trip was a success. However, when a disagreement between Ms. Wangerin and the Model U.N. got back to Ms. Wangerin's supervisors, they told her that she was "just the female chaperone."

81.

Ms. Wangerin was not given a fair chance to follow up on her need for FMLA leave and a reasonable accommodation after she returned from the Washington, D.C. trip.

82.

On February 23, 2023, merely two days after the Model U.N. program had returned, Principal Ferrari and Defendant's Headmaster, Rachel Adams, (hereinafter, "Headmaster Adams") called Ms. Wangerin into a meeting.

83.

During the February 23, 2023 meeting, Ms. Wangerin was told, for the very first time, that her teaching contract was not going to be renewed for the following academic year.

84.

Ms. Wangerin was shocked by this news, and she explained to Principal Ferrari and Headmaster Adams that she had dealt with so much illness recently, but had continued to work despite those challenges, to the detriment of her own health and energy levels and ability to care for her ailing father.

85.

Ms. Wangerin also noted that she had requested a medical leave of absence the prior month, which the HR Director, who was also present in the February 23rd meeting, confirmed had indeed been Wangerin's request.

86.

Principal Ferrari told Ms. Wangerin that she could submit her resignation the following day.

87.

Headmaster Adams also added that Ms. Wangerin's contract was not being renewed because Defendant "wanted to move in another direction." When Ms. Wangerin tried to press for more information, Headmaster Adams told Ms. Wangerin that there had been parents who complained.

88.

Upon information and belief, Defendant did not receive parental complaints about Ms. Wangerin, or that any complaints that Defendant did receive were not credible.

89.

Regardless of whether Defendant actually received parental complaints about Ms. Wangerin around this time, Defendant's decision not to renew Ms. Wangerin's teaching contract had nothing to do with such complaints.

90.

During the February 23, 2023 meeting, Headmaster Adams told Ms. Wangerin that she could tell her own story concerning her separation, and that Ms. Wangerin was free to tell others that she resigned for health reasons.

91.

At no point did Ms. Wangerin resign voluntarily for any reason.

92.

It was Defendant's decision not to renew Ms. Wangerin's teaching contract, and Defendant made the decision for reasons related to the health of Ms. Wangerin and at least one member of her immediate family.

93.

During the February 23, 2023 meeting, Ms. Wangerin repeated the fact that her prior requests for reasonable accommodation were ignored.

94.

The administrators merely responded by saying that Ms. Wangerin had missed seventeen days of work so far that academic year.

95.

Of the seventeen days referenced, Defendant required Ms. Wangerin to be out for 10 of those days when her daughters were infected with COVID-19, Ms. Wangerin was out for one day in order to report for jury duty, and the remaining six absences referenced were all directly related to Ms. Wangerin's medical conditions.

96.

Defendant later sent a letter dated March 6, 2023, advising Ms. Wangerin that Defendant would not be renewing her teaching contract.

97.

On March 15, 2023, Ms. Wangerin asked to meet one-on-one with Headmaster Adams. During that meeting, Ms. Wangerin asked if the Headmaster was aware of the issues with her

health that she had been experiencing, and Ms. Wangerin asked why Defendant had not worked with Ms. Wangerin like it had for other teachers with health issues.  Even though Headmaster Adams had been in the February 23, 2023 meeting, she told Ms. Wangerin that she had not been made aware of the fact that Ms. Wangerin had issues with her health.

98.

When Ms. Wangerin confirmed that she had indeed requested accommodations, Headmaster Adams ended the meeting by telling Ms. Wangerin that she would see what she could do.

99.

Headmaster Adams approached Ms. Wangerin soon thereafter, and she advised Ms. Wangerin that she had approached the school's Head Librarian and had a possible solution.

100.

On May 1, 2023, Headmaster Adams sent an email to Ms. Wangerin confirming the details of this proposed solution that the two had previously discussed, which would have been an alternative to the non-renewal of Ms. Wangerin's contract.

101.

Specifically, and after first noting that Headmaster Adams "[had] no doubt [Ms. Wangerin] will be an incredible resource for the [Middle and Upper School] students" and that Ms. Wangerin would help Defendant meet its goal of attracting more students to the library, Defendant offered Ms. Wangerin a position working in the library for four-days per week.

102.

Under that proposal, the fifth day of the week would be reserved to allow Ms. Wangerin to serve as a substitute teacher.

103.

Headmaster Adams also  told Ms. Wangerin that she was considering allowing her to continue supporting the Mock Trial team, and having Ms. Wangerin continue interacting directly with students by supervising and assisting Defendant's self-study program.

104.

Indeed, taking this position would require Ms. Wangerin to agree to an approximately $20,000.00 reduction in her annual pay.

105.

Despite the pay cut, Ms. Wangerin appreciated the proposal for the library position because it would have allowed her to continue working, while prioritizing her own needs for her health.

106.

Ms. Wangerin had also received an offer from another local private school to serve as a teacher for the 2023-2024 academic year, a position with more compensation and a better benefits package than she was receiving in her teaching job with Defendant.

107.

After Headmaster Adams offered Ms. Wangerin the library position, she declined the job offer to teach at the other private school.

108.

However, on May 17, 2023, Headmaster Adams sent another email to Ms. Wangerin, advising her that Defendant was withdrawing the offer for Ms. Wangerin to serve as the "Library Assistant."

109.

Headmaster Adams' only justification was that she and the Head Librarian had decided to go in another direction.

110.

After Ms. Wangerin was advised that the offer for the library position was being withdrawn, Ms. Wangerin found that the teaching position with the other private school was no longer available.

111.

Ms. Wangerin continued to perform her job for the remainder of the school year.

112.

After Ms. Wangerin had a conversation with the Chair of Defendant's Board of Directors about the non-renewal of her contract, members of the administration ostracized Ms. Wangerin and almost completely refused to interact with her.

113.

At the end of the school year, Ms. Wangerin had the pleasure of seeing her own daughter walk across the graduation stage.

114.

Additionally, then Valedictorian for the Class of 2023 specifically thanked Ms. Wangerin during his graduation speech, and the Valedictorian's mother also told Ms. Wangerin that Wangerin's class had changed her son's life.

115.

When it was time for Ms. Wangerin to pack up her classroom and belongings after the end of the academic year, Defendant's administration refused to allow Ms. Wangerin to access files

and materials that she created and saved on her work computer, and they would not allow Ms. Wangerin to remain anywhere on campus without an escort.

116.

Not only was Ms. Wangerin treated very differently than how Defendant treated its teachers and other employees whom Ms. Wangerin had observed departing their position. Ms. Wangerin felt like Defendant was treating her like a criminal.

117.

Any suggestion by Defendant that it decided not to renew Ms. Wangerin's contract due to an anticipated drop in student enrollment for the subsequent academic year is not true. Moreover, Defendant's anticipated enrollment for the following year was approximately the same if not more than at the time her contract was not renewed.

118.

Any suggestion by Defendant that it decided not to renew Ms. Wangerin's contract because her position was eliminated is also not true.

119.

After Defendant advised Ms. Wangerin that her contract was not being renewed, Defendant posted a job listing for the exact position that Ms. Wangerin held.

120.

Defendant offered the position previously held by Ms. Wangerin to a teacher who was previously teaching 8th Grade History.

121.

Defendant offered the 8th Grade teaching position to a male employee, who had previously served as a substitute for Defendant, who unlike Ms. Wangerin, neither had formal training as an educator nor had been a certified teacher in Georgia or otherwise.

122.

Defendant also filled the vacant Library Assistant position that it initially offered to Ms. Wangerin for the 2023-2024 academic year.

Procedural/Administrative Background

123.

On or about August 22, 2023, Ms. Wangerin submitted her Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC"), alleging that she had been subjected to discrimination based on her sex and disability, including that Defendant refused to provide a reasonable accommodations, and that she had been subjected to retaliation after engaging in protected activities.  The EEOC assigned Ms. Wangerin Charge Number 410-2023-06417.

124.

Defendant had actual notice of the EEOC Charge, participated in the administrative proceedings, and was represented by counsel at that time.

125.

The EEOC issued a Determination and Notice of Rights, or the "Right to Sue," dated June 18, 2025, which Ms. Wangerin received through counsel on August 20, 2025.

126.

Ms. Wangerin has exhausted her administrative remedies as to her Charge of Discrimination, and she is filing the instant action within ninety days of the issuance and her receipt of the Right to Sue.

**COUNT I:**
**DISCRIMINATION IN VIOLATION OF**
**THE AMERICANS WITH DISABILITIES ACT**

127.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 126, as if the same were set forth herein.

128.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

129.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

130.

As alleged herein, Plaintiff had been employed with Defendant for several years as a teacher.  Plaintiff had been performing her duties in that role, and she was otherwise qualified and able to perform the essential functions of his job, with or without a reasonable accommodation.

131.

Plaintiff's performance in her role as a teacher was satisfactory, if not exemplary, at all

relevant times.

132.

As alleged herein, Plaintiff has disabilities, a history of disabilities, and was perceived by Defendant as having disabilities, that substantially limits a number of major life activities.

133.

Specifically, Plaintiff lives with Idiopathic Hypersomnia, a rare sleep disorder that causes individuals like Plaintiff to feel fatigued and sleepy throughout the day, and substantially limits a number of major life activities like sleeping, performing manual tasks, and working.

134.

Defendant was aware of Plaintiff's disabilities.

135.

As alleged herein, Defendant advised Plaintiff on February 23, 2023 that Defendant was not going to renew Plaintiff's teaching contract for the following academic year.

136.

Defendant based its decision not to renew Plaintiff's teaching contract specifically because of Plaintiff's disabilities and the accommodations that Plaintiff needed as a result.

137.

As alleged herein, Defendant initially offered Plaintiff a position as a Library Assistant on May 1, 2023.

138.

Defendant further injured Plaintiff by withdrawing its offer for Plaintiff to serve as a Library Assistant after Plaintiff had accepted the offer and declined an opportunity with another employer.

139.

Defendant's decision to withdraw its offer for Plaintiff to serve as Library Assistant was based solely on Plaintiff's disabilities and the accommodations that she required as a result.

140.

Because Defendant decided not to renew Plaintiff's teaching contract, and because Defendant withdrew its offer for Plaintiff to serve as Library Assistant, Plaintiff's employment with Defendant ended at the conclusion of the 2022-2023 academic year.

141.

After Plaintiff's employment was terminated, Defendant replaced Plaintiff with a less qualified individual who is not disabled and did not otherwise need a reasonable accommodation.

142.

Plaintiff has been injured by Defendant's discrimination based on disability, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including backpay, injunctive relief in the form of reinstatement and/or front pay, compensatory and punitive damages in the amount of $300,000.00 or otherwise provided by statute, and reasonable attorney's fees and costs of litigation, in an amount to be proven at trial.

## COUNT II:
## FAILURE TO PROVIDE REASONABLE ACCOMMODATION
## IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

143.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 126, as if the same were set forth herein.

144.

The Americans with Disabilities Act prohibits covered entities from "discriminating

against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

145.

Discrimination based on disability includes an employer's failure to make a "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

146.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

147.

As alleged herein, Plaintiff had been employed with Defendant for several years as a teacher.  Plaintiff had been performing her duties in that role, and she was otherwise qualified and able to perform the essential functions of his job, with or without a reasonable accommodation.

148.

Plaintiff's performance in her role as a teacher was satisfactory, if not exemplary, at all relevant times.

149.

As alleged herein, Plaintiff has disabilities, a history of disabilities, and was perceived by Defendant as having disabilities, that substantially limits a number of major life activities.

150.

Specifically, Plaintiff lives with Idiopathic Hypersomnia, a rare sleep disorder that causes individuals like Plaintiff to feel fatigued and sleepy throughout the day, and substantially limits a number of major life activities like sleeping, performing manual tasks, and working.

151.

Defendant was aware of Plaintiff's disabilities and her need for a reasonable accommodation.

152.

As alleged herein, Plaintiff requested accommodations for her disabilities on numerous occasions, beginning in Fall 2020. Specifically, Plaintiff requested accommodations in the form of leave for the purposes of seeking testing and treatment, reducing the number of classes or the number of different subjects that Plaintiff would be required to teach, not being assigned a homeroom in order to allow for additional planning time, or a transfer to an open position as a Library Assistant.

153.

Defendant was aware of Plaintiff's aforementioned requests for reasonable accommodation.

154.

Each of the accommodations requested was available, would have been effective, and would not have posed an undue hardship on Defendant.

155.

Defendant not only failed to provide to provide the requested accommodations, Defendant

terminated Plaintiff's employment when it decided not to renew her teaching contract in Spring 2023.

156.

In addition to Defendant's failure to provide a reasonable accommodation, Defendant also refused to take legitimate efforts to engage Plaintiff in the interactive process, despite Plaintiff repeated efforts to do so.

157.

Plaintiff has been injured by Defendant's discrimination based on disability due to its failure to provide a reasonable accommodation, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including backpay, injunctive relief in the form of reinstatement and/or front pay, compensatory and punitive damages in the amount of $300,000.00 or otherwise provided by statute, and reasonable attorney's fees and costs of litigation, in an amount to be proven at trial.

**COUNT III:**
**RETALIATION**
**IN VIOLATION OF AMERICANS WITH DISABILITIES ACT**

158.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 126, as if the same were set forth herein.

159.

The Americans with Disabilities Act prohibits covered entities from discriminating against any individual because such individual has opposed any act or practice made unlawful by the Americans with Disabilities Act or because said individual has filed a Charge of Discrimination. 42 U.S.C. § 12203(a).

160.

Mistreatment based on participation in a protected activity merely requires a showing that the conduct "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020).

161.

As alleged herein, beginning in Fall 2020 and continuing through the separation of her employment in Spring 2023, Plaintiff sought reasonable accommodations for her disabilities, and was therefore engaged in activities protected by the Americans with Disabilities Act.

162.

As a result of Plaintiff's efforts to obtain a reasonable accommodation for her disability, Defendant's advised Plaintiff in February 2023 that it was not going to renew Plaintiff's teaching contract, effectively terminating Plaintiff's employment.

163.

As a result of Plaintiff's efforts to obtain a reasonable accommodation for her disability, Defendant withdrew its offer to allow Plaintiff to transfer into the open position of Library Assistant.

164.

Defendant was aware that deciding not to renew Plaintiff's teaching contract, withdrawing an offer to transfer Plaintiff into the open position of Library Assistant, or terminating Plaintiff's employment would have dissuaded a reasonable worker, such as Plaintiff, from making a charge of discrimination.

165.

Plaintiff has been injured by Defendant's retaliatory conduct, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including backpay, injunctive relief in the form of reinstatement and/or front pay, compensatory and punitive damages in the amount of $300,000.00 or otherwise provided by statute, and reasonable attorney's fees and costs of litigation, in an amount to be proven at trial.

**COUNT IV:**
**DISCRIMINATION**
**IN VIOLATION OF THE REHABILITATION ACT**

166.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 126, as if the same were set forth herein.

167.

The Rehabilitation Act of 1973 prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency…" 29 U.S.C. § 794(a).

168.

Defendant, as a program receiving Federal financial assistance both directly and indirectly from the United States Department of Education, and Plaintiff, as an employee of Defendant, are a covered entity and individual, respectively, under the Rehabilitation Act.

169.

The Rehabilitation Act expressly incorporates the standards used in Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.* 29 U.S.C. § 794(d).

170.

For the reasons set forth in Count I, *supra*, which is incorporated herein by reference, Defendant discriminated against Plaintiff based on disability in violation of the Rehabilitation Act.

171.

Plaintiff has been injured by Defendant's discrimination due to disability, and Plaintiff is entitled to all damages available under the Rehabilitation Act, in an amount to be proven at trial.

**COUNT V:**
**FAILURE TO PROVIDE REASONABLE ACCOMMODATION**
**IN VIOLATION OF THE REHABILITATION ACT**

172.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 126, as if the same were set forth herein.

173.

The Rehabilitation Act of 1973 prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency…" 29 U.S.C. § 794(a).

174.

Defendant, as a program receiving Federal financial assistance both directly and indirectly from the United States Department of Education, and Plaintiff, as an employee of Defendant, are a covered entity and individual, respectively, under the Rehabilitation Act.

175.

The Rehabilitation Act expressly incorporates the standards used in Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.* 29 U.S.C. § 794(d).

176.

For the reasons set forth in Count II, *supra*, which is incorporated herein by reference, Defendant discriminated against Plaintiff based on disability, due to its failure to provide a reasonable accommodation, in violation of the Rehabilitation Act.

177.

Plaintiff has been injured by Defendant's discrimination due to disability, and Plaintiff is entitled to all damages available under the Rehabilitation Act, in an amount to be proven at trial.

## COUNT VI:
## RETALIATION
## IN VIOLATION OF THE REHABILITATION ACT

178.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 126, as if the same were set forth herein.

179.

The Rehabilitation Act of 1973 prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency…" 29 U.S.C. § 794(a).

180.

Defendant, as a program receiving Federal financial assistance both directly and indirectly from the United States Department of Education, and Plaintiff, as an employee of Defendant, are a covered entity and individual, respectively, under the Rehabilitation Act.

181.

The Rehabilitation Act expressly incorporates the standards used in Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.* 29 U.S.C. § 794(d).

182.

For the reasons set forth in Count III, *supra*, which is incorporated herein by reference, Defendant subjected Plaintiff to retaliation after she engaged in protected activities, in violation of the Rehabilitation Act.

183.

Plaintiff has been injured by Defendant's retaliation, and Plaintiff is entitled to all damages available under the Rehabilitation Act, in an amount to be proven at trial.

**COUNT VII:**
**INTERFERENCE WITH RIGHTS**
**IN VIOLATION OF FAMILY AND MEDICAL LEAVE ACT**

184.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 126, as if the same were set forth herein.

185.

At all times relevant to this Complaint, Defendant was a covered, non-exempt employer pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4).

186.

As alleged herein, Plaintiff worked for a covered employer, had worked for the covered employer for at least twelve months, had at least 1,250 hours of service for the employer during the twelve-month period immediately preceding the requested leave, and worked at a location where the employer had at least 50 employees within 75 miles.

187.

At all times relevant to this Complaint, Plaintiff was considered an eligible employee under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(2).

188.

As alleged herein, Plaintiff lives with Idiopathic Hypersomnia, a condition that routinely requires medical treatment, as well as for Plaintiff to be away from work, and as a result qualifies as a serious health condition pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2611(11). During her employment, Plaintiff was also in need of being away from work to care for her father, who was recovering from cancer, and thus had a serious health condition under the FMLA.

189.

Defendant was aware of Plaintiff's need to take leave intermittently as early as Fall 2020, both for her own health conditions and to care for her father.

190.

As alleged herein, Defendant failed to advise Plaintiff of her right to take FMLA leave or its associated procedures, and as a result, ultimately denied Plaintiff's use of FMLA leave from around Fall 2020 through the separation of Plaintiff's employment in Spring 2023. Defendant therefore interfered with, restrained, and denied Plaintiff's exercise of rights provided under the Family and Medical Leave Act. *See* 29 U.S.C. § 2615(a).

191.

As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff sustained loss of earnings, suffered mental anguish, physical and emotional distress, humiliation and embarrassment, and the loss of professional reputation.

192.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(i), Defendant is liable for damages equal to the amount of wages, salary, employment benefits, and other compensation denied or lost to Plaintiff by reason of this violation, in an amount to be proven at trial. Defendant is also liable for interest

on the amounts described herein, calculated at the prevailing rate, and in an amount to be proven at trial.

193.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), due to Defendant's willful violation of the Act and reckless disregard of whether Defendant's conduct was prohibited, Defendant is liable for an additional amount as liquidated damages, equal to any award of monetary damages, in an amount to be proven at trial.

194.

Pursuant to 29 U.S.C. § 2617(a)(1)(B), Defendant is liable for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

## COUNT VIII:
## RETALIATION
## IN VIOLATION OF FAMILY AND MEDICAL LEAVE ACT

195.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 126, as if the same were set forth herein.

196.

In addition to the rights guaranteed by the FMLA, as discussed in Count VII, *supra*, it is also unlawful for any employer to discharge or in any other manner discriminate against any individual because she has exercised her rights under the FMLA. 29 U.S.C. § 2615.

197.

As alleged herein, Defendant subjected Plaintiff to disciplinary action in the form of a Performance Improvement Plan after Plaintiff had to take medical leave that should have been considered FMLA leave.

198.

As alleged herein, Defendant advised Plaintiff in February 2023 that it would not be renewing Plaintiff's teaching contract for the following academic year, which was the direct result in leave that Plaintiff took that should have been considered FMLA leave, and because Defendant was aware that Plaintiff would be in need of additional leave in the future.

199.

As alleged herein, Defendant advised Plaintiff in May 2023 that it was withdrawing its offer to allow Plaintiff to transfer into the open position of Library Assistant, which was the direct result in leave that Plaintiff took that should have been considered FMLA leave, and because Defendant was aware that Plaintiff would be in need of additional leave in the future.

200.

As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff suffered injuries, including a loss of earnings, mental anguish, physical and emotional distress, humiliation and embarrassment, and the loss of professional reputation.

201.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(i), Defendant is liable for damages equal to the amount of wages, salary, employment benefits, and other compensation denied or lost to Plaintiff by reason of this violation, in an amount to be proven at trial.

202.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), due to Defendant's willful violation of the Act and reckless disregard of whether Defendant's conduct was prohibited, Defendant is liable for an additional amount as liquidated damages, equal to the sum of any award of damages under this Count in an amount to be proven at trial.

203.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(ii), Defendant is liable for interest on any award of damages under this Count in an amount to be proven at trial., calculated at the prevailing rate, and in an amount to be proven at trial.

204.

Pursuant to 29 U.S.C. § 2617(a)(1)(B), Defendant is liable for such equitable relief as may be appropriate, including reinstatement and promotion.

## COUNT IX:
### DISCRIMINATION BASED ON SEX
### IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

205.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 126, as if the same were set forth herein.

206.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such person's SEX.  42 U.S.C. § 2000e-2(a).

207.

Plaintiff is considered in a protected class as her sex is female.

208.

As alleged herein, there were numerous occasions in which Defendant treated Plaintiff less favorably than similarly situated employees who were not female.

209.

Ultimately, Defendant treated Plaintiff less favorably than her similarly situated colleagues who were not female, when Defendant decided not to renew Plaintiff's teaching contract in February 2023.

210.

Moreover, even if Plaintiff's position had been eliminated due to student enrollment or a reduction in force, Plaintiff accepted Defendant's offer to allow Plaintiff to transfer into the open position of Library Assistant, but Defendant further discriminated against Plaintiff by withdrawing this offer in May 2023.

211.

Defendant will be unable to present any evidence of a legitimate, nondiscriminatory reasons for the acts and omissions raised herein and for otherwise treating Plaintiff less favorably than her similarly situated counterparts who are not female.

212.

Plaintiff will prove that Defendant's stated reasons are pretextual and were indeed motivated by Plaintiff's sex.

213.

Plaintiff has been injured by Defendant's discrimination of Plaintiff based on sex, and she is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay including fringe benefits, front pay, injunctive relief, compensatory and punitive damages, if available, in the amount of not less than $300,000.00, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Hollie N. Wangerin respectfully prays for the following relief:

1)     That Summons and Process be issued to Defendant Stratford Academy, Inc., and that said Defendant be served as provided by law;

2)     That this matter be tried before a jury;

3)     That judgment be awarded for and in favor of Plaintiff and against Defendant on Count I for discrimination based on disability, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

4)     That judgment be awarded for and in favor of Plaintiff and against Defendant on Count II for failure to provide a reasonable accommodation, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

5)     That judgment be awarded for and in favor of Plaintiff and against Defendant on Count III for retaliation, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

6)     That judgment be awarded for and in favor of Plaintiff and against Defendant on Count IV for discrimination based on disability, and grant Plaintiff all relief allowable under the Rehabilitation Act;

7)     That judgment be awarded for and in favor of Plaintiff and against Defendant on Count V for failure to accommodate, and grant Plaintiff all relief allowable under the Rehabilitation Act;

8)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count VI for retaliation, and grant Plaintiff all relief allowable under the Rehabilitation Act;

9)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count VII for interference with Plaintiff's right to take leave, and grant Plaintiff all relief allowable under the Family and Medical Leave Act;

10)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count VIII for retaliation, and grant Plaintiff all relief allowable under the Family and Medical Leave Act;

11)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count IX for discrimination based on sex, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act; and,

12)      For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 16th day of September, 2025.

KENNETH E. BARTON III
Georgia Bar No. 301171
M. DEVLIN COOPER
Georgia Bar No. 142447
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
mdc@cooperbarton.com